UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bret Steven Hedrington,                          Court File No. 14-cv-1048 (DWF/LIB)

                    Plaintiff,

       v.                                         **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
*Acting Commissioner of Social Security*,

                    Defendant.

Plaintiff Bret Steven Hedrington ("Plaintiff") petitions the Court for judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying Plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). (Compl. [Docket No. 1]). The Court has referred the present case to the undersigned United States Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This matter comes before the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties filed cross-motions for summary judgment, [Docket Nos. 18, 20], and the Court took the motions under advisement on the parties' written submissions. For reasons discussed herein, the Court recommends **DENYING** Plaintiff's Motion for Summary Judgment, [Docket No. 18], and **GRANTING** Defendant's Motion for Summary Judgment, [Docket No. 20].

## I.    STATEMENT OF FACTS

### A.    Procedural History

On May 7, 2012, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits (DIB), and on June 19, 2012, Plaintiff protectively filed a Title

XVI application for supplemental security income; Plaintiff alleged disability beginning on October 17, 2009.[1] (Tr. 20). The Social Security Administration denied Plaintiff's applications, both initially and upon reconsideration. (Tr. 20, 201, 212, 215). Pursuant to Plaintiff's subsequent May 28, 2013, request for hearing by an administrative law judge (ALJ), ALJ Peter C. Erickson conducted a hearing on January 7, 2014. (Tr. 20). On January 17, 2014, the ALJ determined that Plaintiff is not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and denied Plaintiff's applications. (Tr. 33).

Plaintiff requested the Appeals Council review the ALJ's January 17, 2014, decision; the Appeals Council denied review on April 1, 2014. (Tr. 1-4).

On April 11, 2014, Plaintiff filed a Complaint for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff disability benefits. (Compl. [Docket No. 1]).

**B.      Medical Evidence in the Record**

The Court has reviewed the Administrative Record in its entirety, [Docket No. 11], and summarizes Plaintiff's relevant medical history below.

On October 27, 2009, Plaintiff was involved in a motor vehicle accident wherein his body impacted and broke the steering column and his head impacted and broke the windshield of his vehicle. (Tr. 387). Plaintiff arrived at Fairview Lakes Regional Medical Center in Wyoming, Minnesota immediately following the accident for emergency medical attention. (Tr. 379-390). The accident caused Plaintiff to sustain a comminuted interarticular fracture of the base of the first proximal phalanx (right great toe bone) with 6 to 7 mm distraction of lateral fracture

---

[1] Discrepancies exist in the Administrative Record regarding the alleged disability onset date (namely, the date of the underlying motor vehicle accident). Some records state the accident took place on October 17, 2009, while most provide that the accident occurred on October 27, 2009. These discrepancies are largely irrelevant to the Court's analysis herein, as all analyses focus on alleged disability arising from the underlying motor vehicle accident.

fragment; cervical degenerative disc changes most severe at C6-C7; moderate right lateral recess and central narrowing with trace increased signal within right hemicord; prominent posterior central disc herniation at T3-T4 with effacement of the thecal sac but no cord compression; moderate foraminal narrowing right C4-C5; and left posterior paracentral disc herniation C5-C6 extending into left subarticular recess. (Tr. 381, 395).

Several days following the accident, on November 5, 2009, Plaintiff presented at Noran Neurological Clinic in Minneapolis, Minnesota. (Tr. 433). Plaintiff primarily complained of spine and extremity pain. (Id.) Dr. David P. Dorn, MD, noted the nature of motor vehicle accident in his records. (Id.) Plaintiff described what Dr. Dorn referred to as a "generalized headache" that is "sensitive over the forehead," where shards of windshield glass remained. (Id.) Dr. Dorn also noted neck and mid and lower back pain; upper extremity weakness; and pain in the right thigh and right big toe. (Id.) Plaintiff was taking ibuprofen, Naprosyn, and valerian root to manage his pain following the accident. (Tr. 434). Dr. Dorn noted that Plaintiff appeared alert and oriented, that his memory appeared to be intact, and that his mood and affect were appropriate. (Tr. 435). Dr. Dorn's primary impressions were weakness, neck pain, thoracic pain, low back pain, and headache. (Id.) Dr. Dorn recommended that Plaintiff schedule an appointment with an orthopedic surgeon to evaluate his right toe fracture and his upper extremity pain and weakness. (Tr. 436). Dr. Dorn also recommended that Plaintiff schedule an MRI of his cervical spine to ensure that "he does not have a cervical disc compression accounting for the upper extremity weakness." (Id.)

On November 9, 2009, Plaintiff returned to Noran Neurological for an MRI of his cervical spine. (Tr. 430). Dr. Dorn reviewed the images the following day, noting that Plaintiff may require surgery, as the scan revealed that discs were compressing nerves. (Id.)

On November 10, 2009, Plaintiff presented at Lakes Orthopedic Specialists, P.A. in Wyoming, Minnesota, for evaluation of his right toe fracture. (Tr. 429). Dr. Jeffrey D. Ley suspected "FHL disruption at the proximal phalanx" and recommended that Plaintiff schedule an MRI. (Id.) Plaintiff underwent surgical repair of the flexor brevis tendons of his right great toe on November 30, 2009. (Tr. 385-86).

On December 17, 2009, Plaintiff returned to Noran Neurological for a follow-up with Ms. Deborah Osgood, PA-C. (Tr. 427). Plaintiff continued to complain of right arm weakness, although he reported that it was beginning to improve. (Id.) Plaintiff also complained of neck, middle back, and right foot pain. (Id.) PA Osgood noted that Plaintiff had had foot surgery the previous month, as performed by Dr. J. Benjamin Buren. (Id.) PA Osgood reviewed the November MRI scans, noting disc herniations "mildly contacting the ventral cord" and other signs of degeneration. (Id.) During the exam, PA Osgood noted that Plaintiff appeared alert, attentive, oriented, cooperative, and a "good historian." (Id.) PA Osgood noted right grip/biceps/triceps weakness; Plaintiff's left upper extremity was normal. (Id.) PA Osgood informed Plaintiff that Dr. Dorn suggested Plaintiff consult with a neurosurgeon regarding abnormal cord signals in his cervical spine. (Tr. 428).

On December 21, 2009, Plaintiff presented at Neurological Associates, Ltd., in Minneapolis, Minnesota, where Dr. Michael P. McCue performed a neurological exam. (Tr. 423). Dr. McCue noted that Plaintiff experienced headaches, numbness, chills, a loss of energy, sleep and appetite depression, ringing ears, and nosebleeds. (Tr. 424). Dr. McCue reviewed Plaintiff's November 2009 MRI images and determined that the images revealed a paracentral disc herniation at C6-C7 with minimal root impingement and no significant cord compression. (Id.) Dr. McCue opined that Plaintiff did not require spine surgery. (Id.)

Plaintiff returned to Noran Neurological on January 12, 2010. (Tr. 425). Plaintiff continued to complain of daily headaches. (Id.) Plaintiff reported that he would be commencing physical therapy for his foot, neck, and back in the near future and that he had been working with a tennis ball and weights at home. (Id.) PA Osgood's exam indicated that Plaintiff was alert, attentive, oriented, and cooperative. (Id.) Physical exam revealed ongoing right upper extremity/grip weakness. (Id.) PA Osgood instructed Plaintiff to return for a follow-up in approximately one month. (Tr. 426).

On February 16, 2010, Plaintiff returned to Noran Neurological. (Tr. 418). Dr. Dorn noted Plaintiff's ongoing problems included upper extremity weakness and pain, right toe pain, headaches, and neck/mid back/low back/right thigh pain. (Id.) Dr. Dorn continued to prescribe ibuprofen and Naprosyn and added Midrin. (Tr. 419). During the exam, Dr. Dorn observed that Plaintiff appeared alert and oriented and that his memory appeared to be intact. (Id.) Dr. Dorn did not note any physical abnormalities. (Id.) Finally, Dr. Dorn discussed potential means of treating Plaintiff's ongoing headaches; after discussion, Dr. Dorn prescribed and Plaintiff agreed to try amitriptyline. (Tr. 419-20).

On May 24, 2010, Plaintiff represented at Lakes Orthopedic Specialists. (Tr. 414). Dr. J. Benjamin Buren, Plaintiff's surgeon, noted avulsed and ruptured FHB tendons; he instructed Plaintiff to wear more supportive shoes and metatarsal pads. (Id.) Dr. Buren opined that as a result of the lack of sensation and full control over his right toe, Plaintiff would be unable to fly planes. (Id.)

Plaintiff returned to Noran Neurological on June 3, 2010. (Tr. 415). Plaintiff continued to experience nearly daily headaches; the amitriptyline did not appear to help. (Id.) Plaintiff

reported that his neck and lower back were "not too bad" but that his mid back continued to bother him. (Id.) PA Osgood noted continuing right arm/grip weakness. (Tr. 416).

Plaintiff returned to Noran Neurological several weeks later, on June 24, 2010. (Tr. 412). Plaintiff reported that daily headaches were ongoing. (Id.) Again, PA Osgood observed that Plaintiff appeared alert, attentive, oriented, and cooperative. (Id.) PA Osgood recorded decreased right grip strength. (Id.) PA Osgood instructed Plaintiff to increase his propranolol and noted that she would recheck Plaintiff's headaches in several weeks. (Tr. 413). On July 15, 2010, Plaintiff reported that he continued to take ibuprofen for his headaches, along with Excedrin and tramadol; Plaintiff stopped taking the propranolol because it made him dizzy and caused his blood pressure to drop. (Tr. 409). PA Osgood prescribed verapamil in an attempt to alleviate Plaintiff's ongoing headaches. (Tr. 410).

Plaintiff saw Dr. Dorn again on September 7, 2010. (Tr. 404). Dr. Dorn noted that Plaintiff continued to experience headaches and neck pain every day. (Id.) Plaintiff complained of cramping pain in his lower extremities and residual foot pain. (Id.) However, Plaintiff appeared to believe that medication could manage his pain. (Tr. 406). Dr. Dorn informed Plaintiff that if he (Dr. Dorn) continued to prescribe medication(s) for Plaintiff, Plaintiff would need to return for follow-ups every six months or so. (Id.)

Plaintiff returned to see Dr. Dorn on May 5, 2011. (Tr. 399). Dr. Dorn noted that Plaintiff continued to experience symptoms attributable to the October 2009 accident. (Id.) Plaintiff continued to experience low and mid back pain, neck pain, headaches, and foot pain. (Id.) Dr. Dorn recommended Plaintiff try gabapentin; Plaintiff agreed. (Tr. 401). Dr. Dorn also suggested joint injections; Plaintiff did not wish to receive injections. (Tr. 402). Dr. Dorn instructed Plaintiff to return for a follow-up in six months. (Id.)

On November 8, 2011, Plaintiff returned to Noran Neurological. (Tr. 395). Dr. Dorn followed-up on symptoms sustained as a result of Plaintiff's 2009 motor vehicle accident, including back and foot pain and weakness. (Id.) Dr. Dorn told Plaintiff that he no longer had any new treatment suggestions. (Tr. 397).

On March 2, 2012, Plaintiff presented at Family Psychological Services in West St. Paul, Minnesota. (Tr. 439). Ms. Schaen, Plaintiff's attorney, had referred Plaintiff for cognitive, adaptive, and personality assessments. (Id.) During the exam, Plaintiff stated that he had a hard time "keeping track of things," and that he experienced trouble sleeping, headaches, and upper back problems. (Id.) Dr. Ronald L. Hoschouer, PhD, LP, noted that Plaintiff described symptoms associated with depression, mood disturbance, anxiety, stress, and cognitive dysfunction. (Tr. 439-40). After administering a number of tests/assessments, including the Wechsler intelligence assessment, memory index testing, adaptive behavior testing, and MMPI personality testing, Dr. Hoschouer opined that:

> Patients with this clinical profile demonstrate somatic over-concern manifested by hypersensitivity to minor dysfunction and numerous complaints of physical pathology. Their symptoms are likely to involve pain, weakness, and fatigability. The prime defense mechanism is repression. The patient will usually exhibit lack of insight and self-understanding. The anxiety level is probably rather high.

(Tr. 441). Dr. Hoschouer opined that Plaintiff's "self rating" indicated that he experiences some restrictions in daily living, difficulties socializing, and difficulties maintaining concentration, persistence, and/or pace. (Tr. 442). Dr. Hoschouer diagnosed Plaintiff with generalized anxiety disorder with features of mood disturbance and stress symptoms; average intelligence with borderline processing speed; memory deficits with features of extremely low auditory memory and delayed memory; the inability to work; and serious impairment in occupational functioning,

judgment, thinking, and mood. (Id.) Based on the foregoing, Dr. Hoschouer ultimately opined that Plaintiff does not possess the mental capacity to understand, remember, and follow instructions, as a result of his "low processing speed, memory, deficits, and mental health symptoms." (Tr. 443). As a result, Dr. Hoschouer opined that Plaintiff would not be able to maintain attention and concentration in the workplace, or sustain appropriate contact with the public. (Id.) "Because of the combination of all of his diagnoses, Mr. Hedrington will be unable to tolerate the stress and pressure found in an entry-level work place." (Id.)

In October 2012, Dr. Charles J. Hipp, MD, performed a medical examination for Plaintiff's Airman Medical Certificate; Dr. Hipp concluded that Plaintiff experienced residual cognitive impairments and right toe/foot weakness. (Tr. 454-56). Dr. Hipp did not issue Plaintiff a medical certificate. (Id.)

On December 11, 2012, Plaintiff presented to Dr. Travis Hinze, PhD, for a consultative mental status evaluation. (Tr. 467). Dr. Hinze reviewed Dr. Hoschouer's findings, noting that Plaintiff's test results (as recorded by Dr. Hoschouer) were consistent with slowed processing and focused attention and memory problems. (Tr. 468). Dr. Hinze noted that Plaintiff was cooperative and pleasant throughout the evaluation. (Tr. 469). During the exam, Plaintiff complained of fatigue, reduced sleep, poor concentration, and indecisiveness. (Id.) Following the evaluation, Dr. Hinze noted that Plaintiff denied criteria for mood disorder and anxiety, and Dr. Hinze did not "observe those types of issues in him today." (Tr. 470). However, Dr. Hinze *did* observe indicia of memory and attention problems and ultimately diagnosed Plaintiff with cognitive disorder, NOS (memory and attention deficits). (Id.) Dr. Hinze opined that Plaintiff experiences severe problems (1) understanding, remembering, and following instructions, and (2) sustaining attention and concentration; and that Plaintiff would experience significant

problems carrying out work-like tasks with reasonable persistence or pace. (Tr. 471). Dr. Hinze did not believe that Plaintiff would have any major problems (1) responding appropriately to brief and superficial contact with supervisors and coworkers, or (2) tolerating the stress and pressure typically attributable to an entry-level workplace. (Id.)

On January 11, 2013, Plaintiff presented for consultative evaluation by Dr. A. Neil Johnson, MD, with Diagnostic Consultants, P.C. in Cambridge, Minnesota. (Tr. 474). Plaintiff's chief complaint: multiple injuries from motor vehicle accident. (Id.) More specifically, Plaintiff complained of memory problems, daily headaches, trouble sleeping, neck and back pain, and weakness in his right arm and grip. (Id.) During the physical examination, Dr. Johnson noted that Plaintiff was pleasant and cooperative. (Tr. 477). Dr. Johnson concluded that Plaintiff suffers from cognitive impairment (short term memory); right arm and hand weakness; right foot and low leg weakness; and chronic severe headaches as a result of the October 2009 accident. (Tr. 478). Dr. Johnson recommended Plaintiff avoid heights, inclines, uneven surfaces, and machinery. (Id.)

Plaintiff returned to the Noran Neurological Clinic on January 17, 2013. (Tr. 489). Dr. Dorn noted that Plaintiff's "major problem" continued to be his right foot, and Plaintiff continued to experience neck and back pain and right arm weakness. (Id.) Dr. Dorn recommended Plaintiff return for a follow-up in six months. (Tr. 492).

Approximately six months later, on July 18, 2013, Plaintiff presented for a follow-up with Dr. Dorn. (Tr. 518). Plaintiff did not believe that he had experienced any significant changes since his previous visit. (Id.) Plaintiff returned on October 7, 2013, to complete paperwork necessary to appeal his Social Security claim. (Tr. 514). Plaintiff's condition remained largely unchanged. (Tr. 514-15).

Dr. Dorn completed a Headaches: Residual Functional Capacity questionnaire on October 7, 2013. (Tr. 509-513). Therein, Dr. Dorn stated that he had diagnosed Plaintiff with upper extremity weakness and pain; right foot and toe pain with numbness and weakness; headaches; neck pain; thoracic pain; low back pain; and right thigh pain. (Tr. 509). Dr. Dorn described Plaintiff's headaches as "mixed severe" and occurring more than four days per month for more than six hours at a time. (Id.) Dr. Dorn opined that bright lights and lack of sleep trigger Plaintiff's headaches and that Plaintiff has experienced nausea, photosensitivity, mood changes, and mental confusion/inability to concentrate in conjunction with headaches. (Tr. 510). Dr. Dorn stated that lying in a dark room, cold/hot packs, massage, and medication improve Plaintiff's headaches. (Id.) When asked whether Dr. Dorn has observed any objective indicia of Plaintiff's headaches, Dr. Dorn stated that a cervical MRI revealed multilevel degenerative disc disease. (Id.) Dr. Dorn does not expect significant improvement. (Tr. 511).

Dr. Dorn ultimately opined that Plaintiff is not capable of tolerating even "low stress" jobs as a result of persistent symptoms. (Tr. 512). Psychological testing in March 2012 revealed deficits, and, as a result, Dr. Dorn believed that Plaintiff would be unable to tolerate stress and pressure associated with entry-level positions. (Id.) Dr. Dorn stated that Plaintiff would be unable to stand, sit, or walk for prolonged periods of time; unable to crouch, climb, kneel, or bend; unable to use his right foot for fixed, repetitive movements; and unable to use his hands for fine movements or firm grasping. (Id.)

C.    **Hearing Testimony and Statements**

Plaintiff appeared and testified at the January 7, 2014, hearing before the ALJ; Dr. Joseph C. Horozaniecki, MD, serving as the impartial medical expert, and Mr. Kenneth E. Ogren, serving as the impartial vocational expert, also appeared and testified. (Tr. 20).

## 1. Plaintiff's Testimony

Plaintiff's testimony touched on his daily activities and limitations, his living situation, and his persisting symptoms allegedly attributable to the October 2009 accident. Plaintiff testified that he owns a home in Shafer, Minnesota, but that immediately following the October 2009 motor vehicle accident Plaintiff lived with his mother for a time. (Tr. 46, 51). Plaintiff testified that his right foot "still bothers [him]" and that he has trouble balancing. (Tr. 56). Plaintiff testified that he is able to walk on level surfaces for short distances, drive short distances, perform some house work, do laundry every week or two, and cook "easy" meals (Tr. 54-58).

Plaintiff testified that he continues to take amitriptyline and gabapentin, as prescribed by Dr. Dorn, which have helped to lessen his foot pain, in addition to naproxen and tramadol. (Tr. 62-63). Plaintiff testified that his treating doctor, Dr. Dorn, instructed him to stay off his foot as much as possible and to avoid staring at computer screens (i.e., to avoid prolonged, fixed neck positions). (Tr. 65).

Plaintiff testified that he experiences memory problems and daily headaches. (Tr. 66). Plaintiff testified that these symptoms, in addition to ongoing foot pain and right arm weakness, are the primary reasons why he cannot work. (Tr. 66-67). Plaintiff testified that he is able to sit, walk a couple hundred feet without sitting, and use a wheelchair when shopping. (Tr. 70-71).

## 2. Impartial Medical Expert

Following Plaintiff's testimony, Dr. Joseph C. Horozaniecki, MD, specializing in emergency medicine (primary) and occupational medicine (secondary), testified as the impartial medical expert. (Tr. 252). Dr. Horozaniecki testified that Plaintiff suffers from the following physical impairments: chronic neck pain attributable to cervical degenerative disc disease and

spondylosis; mid back pain, attributable to disc disease at T3 and T4; upper extremity weakness; right foot pain and weakness; and headache disorder. (Tr. 76-77). Dr. Horozaniecki placed Plaintiff in the "sedentary" category in terms of functionality and testified that the medical evidence in the record indicates that Plaintiff is capable of standing and walking two hours of an eight-hour workday. (Tr. 77-78). Dr. Horozaniecki also testified that medical evidence in the record precludes Plaintiff from (1) performing any overhead work (to accommodate his neck condition), (2) keeping his neck in a stationary position for a prolonged period of time (again, to accommodate his neck pain), (3) operating machinery with foot pedals (to accommodate his foot condition), and (4) power gripping with the right hand (to accommodate his right upper extremity weakness). (Tr. 78).

The ALJ limited Dr. Horozaniecki's testimony to Plaintiff's physical condition and specifically stopped Plaintiff's counsel from inquiring about potential mental limitations, such as cognitive impairment and/or memory loss. (Tr. 79).

### 3. Impartial Vocational Expert

Finally, Mr. Ogren, the impartial vocational expert, testified. Mr. Ogren owns the Wisconsin Return to Work Center where he places individuals with disabilities in jobs, evaluates individuals with disabilities, and consults with employers, insurance companies, and attorneys. (Tr. 254). Mr. Ogren has a B.S. in Psychology and an M.S. in Vocational Rehabilitation. (Id.)

Having reviewed the record, the ALJ posed a number of hypothetical questions to Mr. Ogren concerning an individual matching Plaintiff's description: an individual with a high school education and work experience as set forth in the vocational report who suffered a traumatic motor vehicle accident and continues to suffer from chronic neck pain secondary to degenerative joint disease and degenerative disc disease, mid back pain secondary to degenerative joint

disease and degenerative disc disease, right upper extremity weakness, right foot pain and weakness following a fracture repair and surgical tendon repair, and headache disorder. (Tr. 81). The ALJ described the hypothetical individual as suffering from depression NOS, anxiety disorder, and a cognitive disorder with some memory deficiencies. (Tr. 81-82). The ALJ adopted Dr. Horozaniecki's opinions and limited the hypothetical individual to a sedentary residual functional capacity (RFC), as limited to lifting 10 pounds occasionally and five pounds more frequently, standing for two hours of an eight-hour workday for no more than 30 minutes at one time, and sitting eight hours of an eight-hour workday. (Tr. 82). The ALJ also prohibited the hypothetical individual from working on uneven surfaces, repetitively rotating his head/neck, maintaining static neck positions for prolonged periods of time, performing overhead work, operating machinery with the right foot, and power gripping with the right hand. (Id.) The ALJ specified that the job would necessarily be simple and unskilled and associated with low-to-moderate stress. (Id.) In response, Mr. Ogren testified that yes, jobs exist in the national economy for the hypothetical individual: that of an inspector (wood) (DOT 669.687-014), a polisher (DOT 713.684-038), and an inspector (clothing) (DOT 685.687-014). (Tr. 82-83). Mr. Ogren specifically testified that his testimony/assessment did not conflict with the jobs as described in the Dictionary of Occupational Titles (DOT). (Tr. 84).

###    D.    The ALJ's Decision

On January 17, 2014, the ALJ held that Plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act from October 17, 2009,[2] through the date of the decision. (Tr. 33). In reaching his decision, the ALJ purportedly applied the Social Security Administration's required five-step sequential analysis for determining whether an individual is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the

---

[2] See footnote 1.

claimant has a severe medically determinable impairment or combination of impairments; (3) whether the claimant's impairment or combination of impairments meets or equals a listed impairment; (4) whether the claimant has the residual functional capacity to perform past relevant work; and (5) whether the claimant is able to perform other work existing in significant numbers in the regional or national economy. (Tr. 21-22); 20 C.F.R. §§ 404.1520(a)-(f), 416.920.

As a threshold matter, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 22).

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 17, 2009, the alleged disability onset date. (Id.)

At step two of the analysis, the ALJ determined that Plaintiff suffers from the following severe impairments: a history of traumatic brain injury; cognitive disorder with memory deficiency; anxiety NOS; depression NOS; right foot pain and weakness, status post fracture and tendon with surgical pair; right upper extremity weakness and chronic neck and thoracic pain secondary to degenerative joint disease and degenerative disc disease; and headache disorder. (Tr. 22-23). The ALJ held that Plaintiff's impairments result in more than minimal limitations on the performance of basic work activities. (Tr. 23).

At step three of the analysis, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. With respect to Plaintiff's physical impairments, the ALJ relied heavily on Dr. Horozaniecki's (the impartial medical expert) testimony that the record lacks objective evidence of a listed impairment. (Id.) The ALJ

held that the record did not demonstrate that Plaintiff met the criteria for Listings 1.02A, 1.02B, 1.03, 1.04, 1.06, 1.08, or 11.03. (Tr. 23-24).

Additionally, the ALJ held that Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal applicable Listings. The ALJ determined that Plaintiff's function reports (completed by Plaintiff's attorney and Plaintiff's mother, at Exhibits 3E and 13E of the Administrative Record), the consultative examinations, and Plaintiff's hearing testimony supported a finding that Plaintiff experienced moderate limitations in daily functioning and concentration, persistence, or pace. (Id.) The ALJ afforded some weight to the state agency consultants' opinions "as a complete review of the evidence during the relevant period and having specialized knowledge in assessing mental impairments and limitations within the Social Security standards for disability." (Id.) Because the record before the ALJ did not indicate that Plaintiff's mental impairments caused at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the ALJ held that Plaintiff did not satisfy "paragraph B" criteria. (Tr. 25). The record did not demonstrate the presence of "paragraph C" criteria. (Id.)

At step four, the ALJ held that Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Tr. 25-26). Specifically, the ALJ found that Plaintiff is capable of lifting and carrying 10 pounds occasionally and five pounds frequently; standing and/or walking two hours of an eight-hour workday for a maximum of 30 minutes at one time; and sitting eight hours of an eight-hour workday. (Tr. 26). The ALJ held that Plaintiff's sedentary work capacity would also necessary preclude overhead work, power gripping with the right hand, working on uneven surfaces, repetitive head rotation or neck flexion, prolonged static neck positions, and operating machinery

with the right foot. (Id.) The ALJ further limited Plaintiff to "simple, unskilled work with low-to-moderate stress." (Id.)

When considering the medical evidence in the record at step four, the ALJ first determined whether Plaintiff suffered from an underlying medically determinable physical or mental impairment, i.e., "an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques," that could reasonably be expected to produce Plaintiff's pain or other symptoms. (Id.) Second, if an underlying physical or mental impairment could reasonably be expected to produce Plaintiff's pain or other symptoms, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work. (Id.) After considering the evidence in the record as a whole, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ held that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were not consistent with the objective medical evidence in the record. (Id.)

Considering and crediting portions of Plaintiff's subjective testimony, the ALJ held that Plaintiff experiences symptoms with heavy lifting or prolonged walking or standing; the ALJ reduced Plaintiff's RFC accordingly. (Id.) Similarly, the ALJ credited Plaintiff's testimony regarding his inability to handle highly complex or stressful work and adjusted the RFC accordingly. (Id.) However, detailing Plaintiff's relevant medical history, the ALJ refused to credit Plaintiff's testimony that he is incapable of all work because of "significant inconsistencies in the record as a whole." (Id.) The ALJ noted that, significantly, Plaintiff never

explicitly testified that *he* believed could not work, only that his doctors *told* him that he could not work. (Tr. 27).

The ALJ afforded the impartial medical expert's (Dr. Horozaniecki's) testimony and opinions significant weight at step four, "given his opportunity to review the entire record including the claimant's testimony, his medical expertise, and his familiarity with the disability review process." (Id.) Additionally, the ALJ afforded greater weight to the impartial medical expert's opinions because his opinions were *more restrictive* – and, accordingly, more favorable to Plaintiff – than the underlying opinions of the state agency consultants. (Id.) "Giving the claimant the benefit of all reasonable doubt, the [ALJ] reduced the residual functional capacity to account for memory and attention deficits that are generally consistent with his overall level of functioning." (Tr. 30). The ALJ did not afford great weight to Dr. Hoschouer's opinion because the opinion "is not fully consistent with the claimant's overall functioning[,]" and because evidence in the record indicated that Plaintiff may exaggerate symptoms and display a tendency to demonstrate "somatic over-concern manifested by hypersensitivity to minor dysfunction and numerous complaints of physical pathology." (Tr. 31). Additionally, the ALJ held that Dr. Hoschouer's opinion regarding a competitive work environment is a *vocational* issue outside of Dr. Hoschouer's expertise. (Id.) The ALJ held that Plaintiff's lifestyle and abilities do not demonstrate an inability to perform employment within the RFC assessed. (Id.)

At the conclusion of step four, the ALJ held that Plaintiff is unable to perform any past relevant work. (Tr. 32).

The ALJ then determined (1) that Plaintiff was a "younger individual" on the alleged disability onset date; (2) that Plaintiff has at least a high school diploma and is able to communicate in English; and (3) that the transferability of Plaintiff's job skills is not material

because, using the Medical-Vocational Rules as a framework, Plaintiff is not disabled, regardless of whether Plaintiff possesses transferable job skills. (Id.)

Finally, at step five of the analysis, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, Plaintiff is capable of performing jobs that exist in significant numbers in the national economy. (Id.) Relying on the impartial vocational expert's testimony, the ALJ determined that Plaintiff is capable of performing the work of an inspector (wood), a polisher, and an inspector (clothing). (Tr. 32-33). The ALJ specifically found that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 33).

## II.      STANDARD OF REVIEW

Judicial review of the Commissioner's decision to deny disability benefits is confined to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). "A reviewing court must affirm the Commissioner's decision if it is supported by substantial evidence contained in the record as a whole." Britton v. Astrue, 622 F. Supp. 2d 771, 774 (D. Minn. 2008) (citing 42 U.S.C. § 405(g); Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001)). Substantial evidence is more than a scintilla, less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (edit in original) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from [the decision's] weight." Coleman, 498 F.3d at 770 (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

The court may not reverse the Commissioner's decision simply because substantial evidence supports the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id.

III.    DISCUSSION

In support of entry of judgment in Plaintiff's favor, Plaintiff argues:

1. That the ALJ erred, as a matter of law, by failing to properly weigh medical opinions of record, properly assess Plaintiff's RFC, and rely on adequate vocational expert testimony;

2. That the ALJ erred, as a matter of law, by failing to fulfill his obligation under the law and regulations to look fully into the issues and fairly evaluate the record; and

3. That the ALJ erred, as a matter of law, in evaluating the third party witness statement and in evaluating Plaintiff's credibility.

(Pl.'s Mem. [Docket No. 19], at 2).

**A.** **Whether the ALJ Properly Weighed Medical Opinions of Record, Properly Assessed Plaintiff's RFC, and Relied on Adequate Vocational Expert Testimony**

**1.** **Dr. Dorn**

With respect to Dr. Dorn, Plaintiff's treating neurologist, Plaintiff appears to argue that the ALJ erroneously afforded no weight to Dr. Dorn's "neurological opinion of headaches" and erroneously did not ascribe weight of any degree to Dr. Dorn's "nonexertional opinions." Plaintiff does not challenge the ALJ's assessment of Dr. Dorn's physical limitations opinions.

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002). However, a treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). An ALJ may discount a treating physician's medical opinion, and adopt a non-treating physician's contrary medical opinion, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when substantial evidence in the record as a whole justifies the ALJ's determination. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). An ALJ may also discount the opinion of a treating physician if other assessments are supported by better, or by more thorough, medical evidence. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986). Courts "have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.

2000) (quoting <u>Rogers</u>, 118 F.3d at 602); <u>Cruze v. Chater</u>, 85 F.3d 1320, 1324-25 (8th Cir. 1996). In other words, the ALJ is not *required* to adopt a treating physician's opinion when, on balance, the medical evidence in the record as a whole convinces him otherwise.

Although applicable regulations permit an ALJ to decline to assign controlling weight to a treating physician's opinion, the ALJ must explain his reasons for doing so:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(c)(2); <u>Prosch</u>, 201 F.3d at 1013 ("Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation.").

Upon the Court's independent review of the record as a whole, the Court finds that the ALJ did not err when he declined to afford Dr. Dorn's October 2013 headache RFC opinions any weight.

In the present case, the ALJ expressly declined to afford Dr. Dorn's "neurological opinion of headaches" – i.e., Dr. Dorn's October 2013 headache RFC opinions – weight because Dr. Dorn's opinion relied exclusively on Plaintiff's subjective complaints and no objective medical evidence. (Tr. 29). "A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements." <u>Peipgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996) (citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991); <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995) ("when the physician's opinion amounts only to a conclusory statement, it is not

entitled to greater weight than other physician's opinion"); Ward, 786 F.2d at 846 (when a treating physician's statements are conclusory, the ALJ may discount his or her opinion in favor of the contrary medical opinion of a consulting physician)). Significantly, "[c]ourts routinely uphold an ALJ's decision to discount a treating physician's [opinion] where the limitations listed on the form "stand alone," and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning." Przybilla v. Astrue, No. 10-cv-1141 (SRN/JJK), 2011 WL 2669483, at *22 (D. Minn. June 20, 2011) report and recommendation adopted, No. 10-cv-1141 (SRN/JJK), 2011 WL 2651770 (D. Minn. July 7, 2011) (quoting Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting, in turn, Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001))).

In the present case, the ALJ specifically noted that Dr. Dorn's headache RFC opinions – namely, that Plaintiff's headaches rendered him incapable of even "low stress" jobs and that Plaintiff is ultimately unable to work – were *not* based on compelling MRI evidence, examinations conducted while Plaintiff experienced a headache, or other objective medical data evidencing and documenting Plaintiff's headaches. (Tr. 29-30). The ALJ noted that the record demonstrated that Plaintiff had not required medical intervention for headaches or any additional attention outside of his biannual follow-ups with Dr. Dorn. (Tr. 30). Furthermore, Dr. Dorn attributed Plaintiff's headaches to a "traumatic brain injury," of which there is *no mention* in any of Dr. Dorn's treatment notes. (Tr. 511). In fact, the ALJ specifically found that nothing in the record indicated that Plaintiff was *ever* diagnosed with a traumatic brain injury. (Tr. 30). The Court's own review of the record corroborates the ALJ's findings. Dr. Dorn's opinion that Plaintiff would be incapable of tolerating even "low stress" jobs as a result of persistent headache symptoms was based entirely on Plaintiff's subjective descriptions of headaches and

the opinions of *other* medical professionals (i.e., no objective documentary support in Dr. Dorn's medical records). (Tr. 512).

Because the ALJ explicitly stated that he afforded Dr. Dorn's headache opinions no weight because they were unsupported by objective medical evidence in the record, the ALJ articulated sufficient reasons for his discount. See Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2006) (a physician's diagnosis that is not based on objective evidence will not support a finding of disability). This Court will not substitute its own judgment for that of the ALJ's. See section II, supra.

Plaintiff also appears to separately argue that the ALJ erroneously did not weigh Dr. Dorn's "nonexertional opinions." However, the Court's review of the record indicates that Dr. Dorn did not provide any opinions concerning Plaintiff's nonexertional/mental limitations *other than his assessment of Plaintiff's headaches*, discussed above. Dr. Dorn only had the opportunity to review Plaintiff's 2012 psychological evaluations *as performed by other medical professionals* (namely, Dr. Hinze). (Tr. 31, 492) Dr. Dorn noted that Plaintiff "was told he did have some cognitive issues related to the accident[,]" and that "[t]he psychologist felt that based on the results of testing, he would not be able to only [sic] stress and pressure of the entry level job[,]" but Dr. Dorn never performed his own psychological assessment of Plaintiff or offered his own nonexertional/mental limitations opinions. (Tr. 490, 515). In fact, Dr. Dorn (and PA Osgood, also with Dr. Dorn's office) consistently noted that Plaintiff appeared alert, oriented, and attentive; demonstrated an intact memory; and proved to be a "good historian" at each of his examinations.

The Court finds Plaintiff's conclusory argument concerning Dr. Dorn's "nonexertional opinions" insufficiently specific, duplicative of his argument concerning Dr. Dorn's headache RFC opinions, and, accordingly, moot.

### 2. Dr. Hoschouer

Next, Plaintiff argues that the ALJ erroneously declined to ascribe weight of any degree to Dr. Hoschouer's "nonexertional opinions."

Generally speaking, examining sources are generally entitled to greater weight than non-examining sources, but less than the controlling weight typically reserved for treating physician opinions. Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006).

First, Plaintiff is incorrect that the ALJ did not assign any weight designation to Dr. Hoschouer's nonexertional opinions. The ALJ discussed Dr. Hoschouer's test results and opinions at length and ultimately declined to afford the opinion "great" weight. (Tr. 30-31). The ALJ did not afford the opinion *no* weight. Specifically, the ALJ declined to afford Dr. Hoschouer's opinion great weight because "this is the claimant's first mental health evaluation and/or contact" and, more significantly, because the opinion was not consistent with Plaintiff's overall functioning. (Tr. 31). The ALJ also questioned the *validity* of the opinion because Dr. Hoschouer's exam also suggested that Plaintiff had a tendency to exaggerate symptoms and demonstrate "somatic over-concern manifested by hypersensitivity to minor dysfunction and numerous complaints of physical pathology." (Id.) The ALJ also specifically declined to adopt Dr. Hoschouer's opinion concerning Plaintiff's capabilities in a competitive work environment because vocational issues fall outside of Dr. Hoschouer's expertise. (Id.)

The ALJ specifically articulated why he declined to afford Dr. Hoschouer's opinions great weight. Dr. Hoschouer, a consulting examining source, is *not* entitled to controlling weight

as he is not a treating physician. The ALJ afforded Dr. Hoschouer's opinions *some* weight, as evidenced by the fact that he stated he would not afford the opinions *great* weight and the fact that the ALJ ultimately limited Plaintiff's RFC to "simple, unskilled work with low-to-moderate stress." (Tr. 26, 30). The ALJ specifically gave Plaintiff "the benefit of all reasonable doubt" and reduced Plaintiff's RFC "to account for memory and attention deficits[.]" (Tr. 30).

Because the ALJ specifically considered Dr. Hoschouer's opinions and findings and articulated reasons for not affording the non-treating opinions great weight, the Court finds that the ALJ did not err when weighing Dr. Hoschouer's nonexertional opinions.

### 3. Dr. Hinze

Third, Plaintiff argues that the ALJ erroneously declined to ascribe weight of any kind to Dr. Hinze's "nonexertional opinions."

The ALJ seemingly afforded Dr. Hinze's opinions limited to no weight: the ALJ gave preferred weight to the state agency consultants' opinion that Dr. Hinze's opinions "hinged entirely on the claimant's memory deficits that presumably related to TBI, which was not documented in the first 2.5 years following his accident and the effects of which only began to be noticed in March 2012." (Tr. 30). The ALJ also elected to rely on the state agency consultants' opinion – as corroborated by the ALJ's own independent review of the record – that the record was (1) devoid of radiographic evidence of a TBI, and (2) included evidence that Plaintiff is prone to exaggerating symptoms. (Id.)

Later in the opinion, the ALJ details Dr. Hinze's exam observations and opinions, including Plaintiff's performance during several "mental activity" tests. After detailing Dr. Hinze's findings, the ALJ does not explicitly state one way or another the weight afforded the opinions. However, the ALJ appears to largely discount Dr. Hinze's opinions and observations,

as the "opinion hinges on memory deficits related to TBI that is not documented and MMPI evidence of exaggeration of symptoms and hypersensitivity to minor dysfunction." (Tr. 31).

As with respect to Dr. Hoschouer's opinions, the ALJ specifically articulated why he declined to afford Dr. Hinze's opinions weight, namely, because other medical evidence in the record did not corroborate Dr. Hinze's findings, and because Dr. Hinze's findings relied on the fact that Plaintiff sustained an otherwise undocumented TBI. Dr. Hinze, like Dr. Hoschouer, is a consulting examining source and is *not* entitled to controlling weight. The ALJ reviewed and weighed the medical evidence in the record and articulated his reasons for not affording Dr. Hinze's opinions great weight.[3]

Because the ALJ specifically considered Dr. Hinze's opinions and findings and articulated reasons for not affording the non-treating opinions weight, the Court finds that the ALJ did not err when weighing Dr. Hinze's opinions.

### 4. Dr. Hipp

Plaintiff, in a quasi-throw-away fashion, argues that the ALJ also erred when he declined to discuss Dr. Hipp's opinion that Plaintiff experienced "residual cognitive impairments," headaches, and reduced right foot toe flexor strength.

As briefly mentioned in the Court's summary of the medical evidence in the record, see section I.B., Dr. Hipp reviewed Plaintiff's application to continue working as a commercial pilot and ultimately decided to defer Plaintiff's certificate for further evaluation, as a result of abnormal presentation in "[u]pper and lower extremities (strength and range of motion)." (Tr. 456-58). In the "medical history" section of Dr. Hipp's limited records, Dr. Hipp noted that

---

[3] As articulated above with respect to Dr. Hoschouer's opinions, the ALJ gave Plaintiff "the benefit of all reasonable doubt" and presumably afforded *some* weight to Dr. Hinze's opinions because the ALJ reduced Plaintiff's RFC to account for memory and attention deficits. (Tr. 31).

Plaintiff experienced a "significant motor vehicle accident with residual cognitive impairments, headaches, and toe weakness *see enclosed records*[.]" (Tr. 456) (emphasis added).

The record contains sparse information concerning Dr. Hipp and his exam; however, it is evident that he is not a treating physician. Although the ALJ does not expressly mention Dr. Hipp in his decision, it is evident that Dr. Hipp's "opinion" concerning Plaintiff's "residual cognitive impairments" is not based on Dr. Hipp's *own* evaluation and/or findings but was taken from Plaintiff's *attached medical records*. The Court finds no reason, nor does Plaintiff articulate any compelling reason, why the ALJ should have considered Dr. Hipp's records when the information contained therein was simply a restatement of other physician's opinions extracted from other medical records. The limited information Dr. Hipp provided in his airman's exam is ultimately cumulative of information the ALJ *did* discuss in his decision. The Court finds that the ALJ did not err in neglecting to mention Dr. Hipp in his decision.

### 5. Dr. Johnson

Consistent with Plaintiff's foregoing arguments, Plaintiff argues that the ALJ erroneously declined to assign any weight designation to Dr. Johnson's physical opinions and erroneously afforded Dr. Johnson's opinion regarding cognitive impairment and short term memory no weight.

Despite Plaintiff's contentions to the contrary, the ALJ discussed and credited Dr. Johnson's findings concerning Plaintiff's physical health. The ALJ details Dr. Johnson's findings and observations, including Plaintiff's antalgic, small-stepped gait with a severe limp to the left; no ability to tandem walk, squat, or hop; diminished range of motion in the cervical spine and dorsolumbar spine; full range of motion of the shoulders and elbows; and diminished range of motion of the knees, right ankle, and right wrist. (Tr. 29). The ALJ noted Dr. Johnson's findings

regarding weakness in Plaintiff's upper extremities. (<u>Id.</u>) Although the ALJ never *expressly* stated the precise weight he afforded Dr. Johnson's findings and opinions concerning Plaintiff's physical health and limitations, the ALJ's extensive discussion of Dr. Johnson's report when read in the larger context of the decision, coupled with the fact that the ALJ specifically states that he afforded no weight to only *one* of Dr. Johnson's opinions, indicates that he considered and credited Dr. Johnson's opinions as an examining physician. Plaintiff does not identify how the ALJ's RFC does not account for Dr. Johnson's physical opinions. The Court finds no merit to Plaintiff's argument.

With respect to Dr. Johnson's opinion concerning Plaintiff's cognitive impairment and short term memory, the ALJ explicitly declined to give weight to this opinion "in the absence of objective findings." As with respect to the ALJ's consideration of Dr. Hoschouer's and Dr. Hinze's opinions, the ALJ specifically considered Dr. Johnson's opinion concerning Plaintiff's cognitive impairment and short term memory and articulated a specific reason for not affording the non-treating opinion weight. If an ALJ is justified in declining to afford weight to a *treating* physician's opinion when it is not supported by objective evidence/test results, then he may certainly devalue the opinion of a *non-treating*, examining source for the same reason. <u>See</u> section III.A.1., <u>supra</u>.

The Court finds that the ALJ did not err when weighing Dr. Johnson's opinions.

**6.      Dr. Horozaniecki**

Finally, in connection with the foregoing, Plaintiff appears to take issue with the fact that the ALJ afforded Dr. Horozaniecki's opinions significant weight when determining Plaintiff's RFC.

The ALJ found that Dr. Horozaniecki "reviewed the entire record and credibly testified to a lack of objective evidence supporting a listed impairment." (Tr. 23). The ALJ then gave Dr. Horozaniecki's opinions concerning Plaintiff's RFC "significant weight" as a result of "his opportunity to review the entire record including the claimant's testimony, his medical expertise, and his familiarity with the disability review process." (Tr. 27). In fact, the ALJ afforded greater weight to Dr. Horozaniecki's opinions than the opinions of other nonexamining sources because they were *more* restrictive – i.e., more favorable to Plaintiff. (Id.)

"[T]he opinions of nonexamining sources are generally . . . given less weight than those of examining sources." Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (citing Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008); 20 C.F.R. § 404.1527(d)(1)). "[W]hen evaluating a nonexamining source's opinion, the ALJ evaluates the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." Wildman, 596 F.3d at 967 (citations omitted).

However, when the ALJ determines that he cannot rely on a treating doctor's opinion, and the ALJ conducts an independent review of the record, the ALJ is entitled to rely upon the opinions of consulting physicians. McNelis v. Astrue, No. 11-cv-16 (SRN/LIB), 2012 WL 838408 (D. Minn. Feb. 3, 2012) report and recommendation adopted, No. 11-cv-16 (ADM/LIB), 2012 WL 837116 (D. Minn. Mar. 12, 2012); Thiele v. Astrue, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012) ("[I]f the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination.").

The Court takes this opportunity to note that the ALJ explicitly limited Dr. Horozaniecki's testimony to Plaintiff's *physical* limitations; the ALJ afforded Dr. Horozaniecki's opinions significant weight when determining Plaintiff's *physical* limitations and, accordingly, those aspects of his RFC. Additionally, the ALJ did not *exclusively* rely on Dr. Horozaniecki's opinions when determining Plaintiff's physical limitations. The ALJ cited to and relied on (1) emergency room records; (2) Dr. Dorn's records regarding Plaintiff's physical health; (3) medical records from Plaintiff's orthopedic surgeon; and, to a limited extent, (4) Dr. Johnson's physical exam notes. (Tr. 27-29). After careful consideration of the entire record, the ALJ set Plaintiff's RFC largely as Dr. Horozaniecki prescribed.[4] Dr. Horozaniecki opined that Plaintiff is capable of performing sedentary work, noting that the medical evidence in the record indicates that Plaintiff is capable of standing and/or walking for a maximum of two hours per eight-hour workday. (Tr. 77-78). Dr. Horozaniecki further limited Plaintiff to no overhead work, no static neck positions, no working on uneven surfaces, no operating machinery with the right foot, and no power gripping with the right hand. (Tr. 78).

The ALJ did not simply adopt Dr. Horozaniecki's recommended RFC; the ALJ incorporated additional restrictions, including standing and/or walking for no more than 30 minutes at one time and no repetitive head rotation or neck flexion, after review and consideration of the entire record. (Tr. 26). The ALJ did not rely *solely* on the opinion of a non-examining doctor to support his RFC analysis. The ALJ acted within the scope of his discretion by lending significant weight to the impartial medical examiner's opinions, consistent with the objective medical evidence in the record as a whole.

---

[4] At least, with respect to physical limitations. The ALJ incorporated additional limitations to account for Plaintiff's memory and attention deficits.

The Court is satisfied that the ALJ properly weighed the medical opinions in the record and afforded those opinions appropriate weight when considering the record as a whole. See Bentley, 52 F.3d at 785 ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.").

7.  **Substantial evidence in the record as a whole supports the ALJ's RFC determination.**

In accordance with the foregoing, the Court finds that the ALJ appropriately weighed the medical evidence in the record and did not err in his assessment of Drs. Dorn, Hoschouer, Hinze, Hipp, Johnson, and Horozaniecki's opinions. To the extent Plaintiff raises any remaining, colorable argument that the ALJ's RFC determination is unsupported by substantial evidence in the record as a whole, the Court disagrees.

First, with respect to Plaintiff's physical RFC, substantial evidence in the record supports the ALJ's determination that Plaintiff is capable of performing sedentary work as further limited by the ALJ. Treatment notes from Dr. Dorn consistently note Plaintiff's ongoing neck, back, and right foot pain in addition to right upper extremity and grip weakness. Dr. Dorn opined that Plaintiff is unable to stand or walk for prolonged periods of time and unable to use his hands for firm grasping.[5] The ALJ's RFC accounts for these limitations. Testimony by Plaintiff himself indicates that Plaintiff experiences pain when performing heavy lifting and walking or standing for prolonged periods of time; however, Plaintiff stated that he is able to walk short distances, drive short distances, perform some housework, do laundry, and prepare "easy" meals. Dr. Horozaniecki placed Plaintiff in the "sedentary" category in terms of functionality and testified that the medical evidence in the record indicates that Plaintiff is capable of standing and walking two hours of an eight-hour workday. (Tr. 77-78). Dr. Horozaniecki also testified that he would

---

[5] The ALJ did not err when he declined to afford Dr. Dorn's opinion that Plaintiff is unable to perform even "low stress" jobs weight for reasons articulated in section III.A.1., supra.

preclude Plaintiff from (1) performing any overhead work (to accommodate his neck condition), (2) keeping his neck in a stationary position for a prolonged period of time, (3) operating machinery with foot pedals (to accommodate his foot condition), and (4) power gripping with the right hand (to accommodate right upper extremity weakness). The ALJ adopted these limitations accordingly.

In support of the ALJ's decision to reduce Plaintiff's RFC to account for "memory and attention deficits that are generally consistent with his overall level of functioning" – i.e., limiting Plaintiff to "simple, unskilled work with low-to-moderate stress," the ALJ states:

> The claimant presented in emergency medical evaluation following a motor vehicle accident in October 2009. He presented as alert although he sustained a laceration to his head. On initial neurological evaluation, he denied loss of consciousness at the scene. On examination, he was alert and oriented with normal speech, intact memory, and appropriate mood and affect. He denied any problems with depression. . . . He made no complaint or concern about his cognitive or emotional return to flying. On return to neurology in December 2009, he was alert, attentive, oriented and cooperative. He was a good historian. Affect and mood appeared stable.

(Tr. 30). Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff did not suffer a traumatic brain injury that produced incapacitating mental impairments (at either step three or step four of the analysis). First, none of the initial emergency treatment providers diagnosed or otherwise documented a traumatic brain injury (other than to identify that Plaintiff's head collided with the windshield), nor *any* change in Plaintiff's mental status whatsoever. (Tr. 379-86, 387-90). To the contrary, emergency room documents noted that Plaintiff did not appear to be in any acute distress; Plaintiff was alert and oriented with no neurological deficits. (Tr. 387, 389). Second, Dr. Horozaniecki, whose primary specialty is emergency medicine, did not identify any neurological impairments, such as a TBI. (Tr. 76-77).

Third, Dr. Dorn, Plaintiff's treating neurologist, and PA Osgood, with Dr. Dorn's office, *consistently* observed that Plaintiff was alert and oriented with an intact memory and proved to be a "good historian" visit after visit.

The ALJ also afforded some weight to the state agency consultants' opinions. (Tr. 30). In February 2013, state agency consultant Dr. Boyd opined that Plaintiff "retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive instructions, but would be markedly impaired for detailed or complex/technical instructions." (Tr. 103). Additionally, Dr. Boyd opined that Plaintiff is capable of carrying out routine, repetitive tasks but would have trouble completing complex, detailed tasks. (Tr. 104). Ultimately, Dr. Boyd opined that Plaintiff is capable of handling stress associated with a routine, repetitive work setting, and that Plaintiff's mental functional capacity contradicted the medical source statement by Dr. Hinze, and "the medical evidence in the file does not corroborate the level of severity described by the medical source statement." (Tr. 105). A second state agency consultant, Dr. Alsdurf, provided opinions that were nearly identical to Dr. Boyd's in his May 8, 2013, evaluation. (Tr. Exhibits 11A, 12A).

Substantial evidence in the record supports the ALJ's determination that Plaintiff did not suffer a TBI or any mental impairments/limitations attributable to a TBI. The ALJ nevertheless accounted for memory and attention deficits in his RFC, crediting Plaintiff's own testimony that he would not fair well in highly complex or stressful work.

Substantial evidence in the record as a whole supports the ALJ's determination that Plaintiff is capable of performing sedentary work as assessed in the underlying decision. The Court is ever mindful of its incredibly deferential standard of review and it will not substitute its own judgment for that of the ALJ.

### 8.    The Impartial Vocational Expert's Hypothetical

Finally, Plaintiff argues that "[b]ecause the ALJ's RFC did not contain all of the limitations established in the record, the ALJ's hypothetical did not contain all of the limitations supported by the substantial evidence of record[,]" and that, as a result, "the testimony of the vocation expert (VE) at the administrative hearing, that was based on the ALJ's hypothetical question, was not substantial evidence which supported the ALJ's decision." (Pl.'s Mem. [Docket No. 19], at 21). However, because the Court has concluded that the ALJ *did* properly consider and weigh all medical evidence in the record, and that the RFC accurately reflected said assessment, the ALJ presented the VE with a complete hypothetical and the ALJ appropriately relied on Mr. Ogren's opinion as substantial evidence.

### B.    Whether the ALJ Looked Fully into the Issues and Fairly Evaluated the Record

Second, Plaintiff argues that the ALJ failed to fully develop and evaluate the record, arguing that the ALJ erroneously refused to allow the impartial medical expert (Dr. Horozaniecki) to evaluate Plaintiff's mental limitations/mental RFC and consider the "issue of equivalence" – namely, whether Plaintiff's physical limitations when considered *in combination with* his mental limitations met or equaled a listed medical disorder at step three of the ALJ's analysis. Plaintiff argues that the ALJ "failed to consider the impact of the overwhelming evidence of the combined multiple residuals of Plaintiff's traumatic MVA upon his mental functioning[.]" (Pl.'s Mem. [Docket No. 19], at 22-23).

An ALJ has an independent duty to fairly and fully develop the record. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). Social Security Regulation 96-6p provides, in relevant part, that while an ALJ remains the ultimate decision maker regarding the legal question of whether particular impairments meet

or medically equal a listed disorder, an ALJ must receive into evidence an expert opinion on that issue by an appointed physician, and the ALJ must consider the opinion and assign appropriate weight. Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council, SSR 96-6p (S.S.A. July 2, 1996) ("SSR 96-6p"), at 3. The independent expert medical opinion requirement may be satisfied by documents, including a disability determination and transmittal form, signed by a state agency medical consultant that ensures that an independent medical expert's opinion regarding the issue of medical equivalence was obtained at the initial and reconsideration levels of review. Id.

However, an ALJ must obtain an updated (i.e., more complete) medical opinion from a medical expert

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Id. at 3-4.

As mentioned, in the present case, the ALJ explicitly afforded weight to disability determination explanations and transmittals by several state agency consultants (Drs. Boyd, Salmi, Richards, and Alsdurf) at step three of the analysis. (Tr. Exhibits 1A, 2A, 11A, and 12A). Significantly, both Dr. Boyd and Dr. Alsdurf assessed Plaintiff's mental RFC, proceeding to this step *only after determining that Plaintiff's impairments did not meet or medically equal a listed*

*disabling condition*. See 20 C.F.R. § 404.1520 (if claimant is determined to be disabled at one step of the analysis, the ALJ need not proceed to the next step).

The record before the ALJ contained additional medical records created *after* Drs. Boyd and Alsdurf made their disability determinations. Accordingly, SSR-96-6p required the ALJ to obtain an updated opinion of an independent medical expert *only* if the additional evidence, *in the ALJ's opinion*, may have changed Drs. Boyd and Alsdurf's findings that Plaintiff's impairments did not meet or medically equal any listed impairment.

The additional medical records included several exam notes by Dr. Dorn and, most significantly, Dr. Dorn's headache RFC opinions, to which the ALJ assigned no weight. See section III.A.1., supra. In light of the foregoing and the fact that there is no indication that the ALJ took any steps to obtain updated, additional, or "more complete" testimony from an independent medical expert, the Court finds that the ALJ was *not* of the opinion that the additional medical evidence in the record would have changed the state agency consultants' opinions that Plaintiff's impairments did not meet or medically equal a listed disabling disorder. Accordingly, SSR 96-6p did *not* require the ALJ to "complete" or otherwise update the record, nor was Dr. Horozaniecki required to testify to Plaintiff's mental limitations; the ALJ was fully within his rights to rely on the state agency consultants' opinions instead.[6] Plaintiff cites no case law in support of his argument that the impartial medical expert should have considered both exertional and nonexertional limitations in combination, especially when testimony concerning Plaintiff's mental limitations would have fallen outside of Dr. Horozaniecki's specialties (i.e., emergency medicine and occupational medicine).

---

[6] Significantly, the ALJ references SSR 96-6p in his opinion when affording the state agency consultants' opinions weight. (Tr. 24, 30).

The Court finds that the ALJ did not fail to fully and fairly develop and evaluate the record.

### C.     Whether the ALJ Erred when Evaluating Plaintiff's Mother's Third Party Function Report and Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ erroneously failed to consider and credit Plaintiff's mother's "crucial statement" concerning Plaintiff's symptoms and limitations arising from his October 2009 injuries. Plaintiff argues that the ALJ should have considered Ms. Hedrington's opinions "for their substance" and to enhance Plaintiff's own credibility.

### 1.     Judith Hedrington's Third Party Function Report

On October 3, 2013, Ms. Judith Hedrington completed a third party function report with respect to her son, the Plaintiff. (Tr. 357-364). Ms. Hedrington stated that since the October 2009 motor vehicle accident, Plaintiff had experienced severe headaches, trouble walking "very far," and difficulty remembering things and focusing. (Tr. 357). Ms. Hedrington stated that Plaintiff takes pain medication "to make life bearable." (Id.) Ms. Hedrington noted that "everything he [Plaintiff] does takes at least twice as long" and that he needed to be reminded to take his pain medication and to shave. (Tr. 358-59).

20 C.F.R. § 404.1513(d) provides:

> [i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to . . . [o]ther non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

First and foremost, the ALJ explicitly stated that he *did* consider Ms. Hedrington's third party function report: "The undersigned considered the function reports at exhibits 3E [i.e., the function report completed by Plaintiff's attorney] and 13E [i.e., the third party function report

completed by Judith Hedrington] . . . to support moderate limitations in daily functioning and concentration, persistence or pace." (Tr. 24). The ALJ considered Ms. Hedrington's statements that she assisted Plaintiff with cleaning and errands, and that although Plaintiff experienced ongoing memory deficits, he continued to drive and perform household chores, including simple cooking, laundry, and cleaning. (Tr. 24-25).

Applicable Eighth Circuit case law does not require an ALJ to list *specific reasons* for discounting a claimant's relative's opinions when the same medical evidence in the record largely that discredited the claimant's own testimony discredited the relative's. <u>Lorenzen v. Chater</u>, 71 F.3d 316, 319 (8th Cir. 1995) (citing <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992) (arguable deficiency of failing to specifically discredit witness has no bearing on outcome when the witness's testimony is discredited by the same evidence that proves claimant's claims not credible)). Although Ms. Hedrington's third party function report does not explicitly state that she believes Plaintiff is disabled and, therefore, unable to perform work of any kind, the ALJ specifically declined to credit any similarly dispositive aspect of Plaintiff's testimony, after weighing the objective medical evidence of record. The Court presumes that the ALJ discredited this aspect of Ms. Hedrington's opinions for the same reason and, accordingly, did not have to list specific reasons for doing so.

The Court finds that the ALJ did not err in his consideration and valuation of Ms. Hedrington's third party function report. The ALJ considered her testimony, limitedly credited her statements concerning Plaintiff's day-to-day limitations, and presumably rejected any dispositive opinions concerning Plaintiff's disability as in conflict with the objective medical evidence of record, as discussed in the foregoing sections.

## 2.     Plaintiff's Credibility

In connection with Plaintiff's arguments concerning Ms. Hedrington's third party function report, Plaintiff argues that because the ALJ failed to properly consider Ms. Hedrington's description of Plaintiff's limitations, the ALJ failed to recognize that Ms. Hedrington's statements corroborated Plaintiff's testimony and bolstered Plaintiff's credibility.

> In addition to objective medical evidence, an ALJ must examine the claimant's prior work record, and observations by third parties and treating and examining physicians relating to . . . 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions. While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility. The ALJ may discount subjective complaints of pain if they are inconsistent with the evidence as a whole.

Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (internal citations and quotations omitted).

The ALJ credited Plaintiff's subjective testimony that he experiences symptoms when performing heavy lifting or prolonged walking or standing; in fact, the ALJ explicitly relied on this testimony (with the objective medical evidence of record) when articulating and limiting Plaintiff's sedentary RFC. (Tr. 26). The ALJ also credited Plaintiff's testimony that he has difficulty with highly complex or stressful work, and the ALJ accommodated Plaintiff's mental limitations accordingly. (Id.)

The ALJ did *not* credit Plaintiff's testimony that he is incapable of all work as a result of "significant inconsistencies in the record as a whole." (Id.) Significantly, Plaintiff *never* testified that he believed he could not work; rather, he testified that his *doctors* told him that he should not work. (Tr. 27). The ALJ explicitly determined that Plaintiff's testimony largely contradicted objective medical evidence in the record as a whole. (Id.) The record demonstrated that Plaintiff

lives independently in his own home on 14 acres of land, maintains a driver's license and drives, and manages his own finances. (Tr. 31). Plaintiff participated in rebuilding his home from 2010 to 2012. (Id.) Plaintiff is capable of caring for himself, mowing about ten percent of a two acre lawn at a time, doing laundry, cooking simple meals, and shopping with the assistance of a wheelchair or cart. (Tr. 31-32).

Like Ms. Hedrington's third party function report, the ALJ credited aspects of Plaintiff's testimony concerning his daily activities and limitations and declined to credit Plaintiff's general, dispositive opinion that he is disabled as "inconsistent with the evidence as a whole." Casey, 503 F.3d at 695. Because substantial evidence in the record as a whole supports the ALJ's determination that Plaintiff is capable of performing sedentary work as articulated in the ALJ's RFC, see section III.A.7., supra, and because the ALJ did not err in his evaluation of Ms. Hedrington's third party function report, the Court finds that the ALJ did not err in his valuation and consideration of Plaintiff's credibility.

## IV.    CONCLUSION

For the foregoing reasons, and based on all of the files, records, and proceedings here,

**THE COURT HEREBY RECOMMENDS:**

1. That Plaintiff's Motion for Summary Judgment, [Docket No. 18], be **DENIED**; and

2. That Defendant's Motion for Summary Judgment, [Docket No. 20], be **GRANTED**.


Dated: July 27, 2015                                              s/Leo I. Brisbois_____
                                                                  Leo I. Brisbois
                                                                  U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.